# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| OHIO CONTRACTORS ASSOCIATION, | ) | CASE NO. 5:14CV0923 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM OPINION** |
| THE CITY OF AKRON, | ) | **AND ORDER** |
| | ) | |
| | ) | |
| DEFENDANT. | ) | |

Before the Court is the motion for temporary restraining order and preliminary injunction filed by plaintiff, Ohio Contractors Association ("OCA" or "plaintiff"). (Doc. No. 2.) Defendant, City of Akron ("the City" or "defendant"), filed its memorandum in opposition, as supplemented with leave of Court. (Doc. Nos. 11, 15.) Plaintiff filed its reply memorandum. (Doc. No. 17.)[1] On April 30, 2014, following a brief conference with counsel in chambers, the Court conducted a hearing on the record where both parties were represented and presented additional arguments and evidence. For the reasons discussed below, the motion is **DENIED**.

## I. BACKGROUND

On April 29, 2014, OCA filed its verified complaint for injunctive and declaratory relief (Doc. No. 1), alleging that the City's Local Hiring and Workforce Participation Policy

---

[1] Late on May 1, 2014, plaintiff filed the declaration of Richard Dalton, President of the International Union of Operating Engineers Local 18. (Doc. No. 18.) The declaration is presented to support the proposition that, as a signatory to the PLA, Local 18 "has not and will not sign the PLA as the PLA and Local Hiring Policy contained therein requires Local 18 to discriminate against its members based on their residency." (Dalton Decl. [Doc. No. 18-1] ¶ 19.) Aside from the fact that this document was filed much later in the day than the "morning" deadline given to the parties during the hearing, this Court need not, and will not, accept *Mr. Dalton's* characterization of what is or is not discriminatory.

("the Local Hiring Policy") violates the equal protection provisions of both the United States Constitution and the Ohio Constitution.[2]

OCA is an Ohio state-wide trade association comprised of contractors and related businesses that are primarily engaged in construction in the State of Ohio, including construction of state and county highways, bridges, sewage and water treatment facilities, and other construction projects. Among the services that OCA provides to its members is support of the competitive bidding process in public construction. (Compl. ¶ 3.)

OCA alleges that, in accordance with a mandate from the United States Environmental Protection Agency ("USEPA"), the City is undertaking a sewer system improvement program, estimated to cost in excess of $1 billion, to reduce the amount of combined sewer overflow. The program is known as the Combined Sewer Overflow Program ("the CSO Program"). (*Id.* ¶ 9.)[3] On March 17, 2014, City Mayor Don Plusquellic ("the Mayor") announced that the City planned to implement the Local Hiring Policy[4] with respect to contractors who submit bids for work on the CSO Program. (*Id.* ¶ 12.) Although the City Council had passed a resolution on July 22, 2013, committing to the establishment of a local hiring program in connection with the CSO Program, plaintiff alleges that the Council has not passed an ordinance specifically implementing any such policy. (*Id.* ¶¶ 10, 11.)

---

[2] Plaintiff also raised claims under the Akron Municipal Code and Ohio Rev. Code § 735.05. OCA makes an argument that the City is required to award the contract on the Rack 15 Project to the "lowest and best bidder" as required by Ohio Rev. Code § 753.05. (Motion at 31.) As to the Ohio statute, defendant properly argues that "§ 753.05 does not apply . . . because the City's Home Rule powers of local self-government allow the City to implement different procedures and standards than those contained in [the statute]." (Opposition at 72.) This Court agrees. *See Dies Elec. Co. v. City of Akron*, 62 Ohio St. 2d 322, 405 N.E.2d 1026 (1980). As to the Municipal Code, plaintiff never raises this as an argument in its motion, and, thus, the Court need not address it.

[3] In his declaration filed in opposition to the motion, the Manager of the City's Engineering Bureau, James Hewitt, represented that the CSO Program resulted from the Consent Decree entered on January 17, 2014 in *United States of America v. The City of Akron, et al.*, Case No. 5:09-cv-0272 (Adams, J.), requiring improvements to the City's combined sewer system and its waste water treatment plant. (Hewitt Decl. [Doc. No. 11-1] ¶¶ 5-6.)

[4] A copy of the Local Hiring Policy is attached to the complaint as Ex. A. (Doc. No. 1-1.)

Plaintiff's immediate concern relates to bids for the CSO Rack 15 Storage Basin Project ("the Rack 15 Project"), which were due to be opened on April 30, 2014 at 11:00 a.m. (*id*. ¶ 14),[5] less than 24 hours after plaintiff filed its complaint and motion.[6] The bid packet[7] for the Rack 15 Project contained a copy of the Project Labor Agreement ("PLA"), that sets forth the Local Hiring Policy. (*Id.* ¶ 15; *see also* Hewitt Decl. Ex. A-1 [Doc. No. 11-1] at 241-69.) This bid packet was available on April 7, 2014. (Hewitt Decl. ¶ 9.) Although the public notice advertising the bid for the Rack 15 Project announced a pre-bid meeting for April 16, 2014 (*id.* ¶ 10), plaintiff concedes that it was aware of the Local Hiring Policy by at least February 10, 2014, when a "mini-forum" was conducted to "discuss[ ] local hire quotas." (Deft. Hr'g Ex. A [Doc. No. 16].)

Turning to the specifics of the Local Hiring Policy, plaintiff asserts it has several features that place plaintiff's members who are not located within or near the City on an unequal footing with others in bidding on projects in the CSO Program. (Compl. ¶ 16.) Plaintiff alleges as follows:

> 20. Pursuant to the Local Hiring Policy, the mandatory participation level in terms of the total work hours worked on a construction contract ("Project Work Hours") to be performed by residents of the City ("Local Residents") is 30% for projects bid from January 1, 2014, through December 31, 2014.

> 21. The mandatory participation level is to increase by 5% every year for the next four (4) years, capping out at a 50% level for advertised bids starting in January 2018.

---

[5] The parties filed, and the Court approved, a stipulation that the bids would not be opened until after the hearing on April 30, 2014. (Doc. No. 10.) Following the hearing, the Court issued an order directing that the bids should remain sealed, and no contracts be awarded, until further order of the Court. (Doc. No. 12.)

[6] As evidenced by the notice of electronic filing generated by the CMECF system, the complaint was filed electronically at "12:37 PM EDT" on April 29, 2014. The motion for temporary restraining order and preliminary injunction was filed at "12:44 PM EDT."

[7] A copy of the bid packet is attached as Ex. A-1 to the Hewitt Declaration. (*See* Doc. No. 11-1, beginning at 82.)

22. The Local Hiring Policy includes a provision whereby bidding contractors will receive a bid credit "for determination of the lowest bid equal to (a) the number of Project Work Hours to be performed by Local Residents that exceeds the mandatory participation level multiplied by (b) $20." (General Conditions at Section l.03(D).)

23. The Local Hiring Policy allows a contractor to obtain a conditional waiver from the City where the contractor has complied with the requirements of the Local Hiring Policy but no Local Resident is available. (General Conditions at Section 1.04.) Contractors may also accumulate credit hours for hiring Local Residents on other projects within the City that were completed within the previous twelve (12) months and apply those credit hours to the Project to meet the mandatory local hiring requirement. (General Conditions at Section 1.04(A)(l).)

24. Contractors may also agree to sponsor a specified number of Local Residents as new apprentices in trades in which noncompliance is likely and retain those apprentices for the period of the contractor's work on the Project. (General Conditions at Section 1.04(B).)

25. The Local Hiring Policy provides that any contract or subcontractor who fails to satisfy the Local Hiring Policy requirements "shall forfeit . . . to the City an amount equal to the journeyman or apprentice prevailing wage, as applicable, for the primary trade used by the CONTRACTOR or Subcontractor on the Project for each hour by which the Contractor of [sic] subcontractor fell short of the local hiring requirement.... (General Conditions at Section 1.06(D)(l).)

26. The Local Hiring Policy states further that "Project Work Hours performed by residents of states other than Ohio cannot be considered in calculation of the number of Project Work Hours to which the local hiring requirements apply." Thus, contractors who employ only non-Ohio residents will not be required to abide by the Local Hiring Policy.

(Compl. ¶¶ 20-26.) Plaintiff asserts, in summary, that the City, acting "under color of state law pursuant to an official policy, custom, usage, or practice of the City in pursuit of its goal to promote, encourage, and pressure contractors to use certain classes of workers in their bids and on public improvement projects[,] . . . [has acted] in conscious disregard of OCA's members' constitutional equal protection rights." (*Id*. ¶¶ 28-29.)[8]

---

[8] Peppered throughout plaintiff's briefing on its motion are random comments that suggest plaintiff is arguing on behalf of the rights of the individual workers of its members. (*See, e.g.,* Motion at 24: "The City's [Local Hiring

Plaintiff's motion seeks to enjoin the City's enforcement of the Local Hiring Policy, as well as the opening of bids for the Rack 15 Project and the awarding of any contracts for the CSO Program. (*See*, Motion at 22.)

## II. PRELIMINARY INJUNCTION STANDARD[9]

"[T]he plaintiff bears the burden of establishing [its] entitlement to a preliminary injunction." *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009) (citing cases). Preliminary relief is "an extraordinary remedy which should be granted only if the movant carries [its] burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)). "[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion . . . ." *Leary*, 228 F.3d at 739. Ultimately, the decision to grant or deny preliminary injunctive relief rests within the discretion of the district court. *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998); *Planned Parenthood Ass'n v. City of Cincinnati*, 822 F.2d 1390, 1393 (6th Cir. 1987).

Consideration of whether to grant a preliminary injunction is governed by four factors:

---

Policy] impos[es] on employers *and employees* harmful discriminatory requirements. . . . *The employees* will be restricted in their ability to obtain employment and earn money for them and their families.") Despite defendant's argument to the contrary (*see* Doc. No. 11 at 66-68), OCA has standing to sue as an association on behalf of its members. *Friends of Tims Ford v. Tenn. Valley Auth.*, 585 f.3d 955, 967 (6th Cir. 2009) (association has standing so long as "(1) the organization's 'members would otherwise have standing to sue in their own right'; (2) 'the interests it seeks to protect are germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'") (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977)). However, OCA does not have standing to represent the interests of individual employees, who are not its "members."

[9] Plaintiff moved for both a temporary restraining order and a preliminary injunction. The standard is the same for both and, since the Court conducted a hearing, the Court is treating the motion at this juncture as one for a preliminary injunction.

First, the court must determine "whether the plaintiff has established a substantial likelihood or probability of success on the merits" of his claim. *Winnett v. Caterpillar, Inc.,* 609 F.3d 404, 408 (6th Cir. 2010) (internal quotation marks omitted). Second, the court will determine "whether the [plaintiff] would suffer irreparable injury" if a preliminary injunction did not issue. *Bays,* 668 F.3d at 818–19 (citing *Tenke Corp.,* 511 F.3d at 542). Third, the court determines "whether the injunction would cause substantial harm to others." *Id.* at 819. And finally, a court must consider "whether the public interest would be served" if the court were to grant the requested injunction. *Id.*

*Liberty Coins, LLC v. Goodman*, No. 13-3012, -- F.3d --, 2014 WL 1357041, at *5 (6th Cir. Apr. 8, 2014). The four factors are not prerequisites, but are interrelated considerations that must be balanced against each other. *Leary*, 228 F.3d at 736 (citing cases). The first factor–the likelihood of success–is, however, the predominant concern. "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzalez v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997)).

### III. ANALYSIS

#### A.    Likelihood of Success on the Merits

Turning first to the merits of plaintiff's equal protection claim, the Court finds that the likelihood that plaintiff would enjoy success on the merits is remote. Plaintiff contends that the City's Local Hiring Policy violates the Equal Protection Clauses of the United States and Ohio Constitutions[10] because "OCA's members who are not residents of the City are being treated differently . . . than similarly-situated contractors and individuals on the basis of their residence and are threatened with future disparate and unequal treatment." (Doc. No. 2 at 30.)

---

[10] *Spivey v. State of Ohio*, 999 F. Supp. 987, 993 (N.D. Ohio 1998) ("The State of Ohio has adopted federal standards in interpreting Ohio's Equal Protection Clause.") (quoting *Keaton v. Ribbeck*, 58 Ohio St. 2d 443, 391 N.E.2d 307, 308 (1979)).

"No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445, 43 S. Ct. 190, 67 L. Ed. 340 (1923) (internal quote omitted). In essence, the Equal Protection Clause is a "direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985) (cite omitted).

At the motion hearing, the parties agreed that the rational basis standard governs the Court's analysis of plaintiff's equal protection claim. "To survive rational basis scrutiny, the statute need only be rationally related to legitimate government interests, and must be upheld against equal protection challenge if there is any reasonably conceivable state of fact that could provide a rational basis for the classification[.]" *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010) (internal quotes and cites omitted); *see Breck v. State of Michigan*, 203 F.3d 392, 395 (6th Cir. 2000) ("Rational basis scrutiny, a deferential review, only requires a state of facts that provide a conceivable basis for the classification.") (citing *Allied Stores v. Bowers*, 358 U.S. 522, 530, 79 S. Ct. 437, 3 L. Ed. 2d 480 (1959)). As such, "[t]he 'rational basis' test means that courts will not overturn government action 'unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [government's] actions were irrational.'" *Warren v. City of Athens*, 411 F.3d 697, 710-11 (6th Cir. 2005) (quoting *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 84, 120 S. Ct. 631, 145 L. Ed. 2d 522 (2000)).

In evaluating a government's stated rational basis for its actions, the Court may not judge the "wisdom, fairness, or logic of legislative choices." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993). "[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality." *Heller v. Doe by Doe*, 509 U.S. 312, 321, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993). "Generally, '[w]hen social or economic legislation is at issue [and a fundamental right is not implicated], the Equal Protection Clause allows the States wide latitude.'" *Liberty Coins*, 2014 WL 1357041, at *8 (quoting *Cleburne*, 473 U.S. at 440) (alterations in *Liberty Coins*).

The City argues that its Local Hiring Policy is rationally related to two legitimate government interests: (1) "returning and reinvesting" to the taxpayers of Akron some of the tax money that will finance this public works project; and (2) "reducing local unemployment and combating declining incomes" of its residents. (Doc. No. 11 at 71-72.) Applying the deferential rational basis standard, the Court finds that these two legitimate government interests are likely to pass constitutional muster.

Courts have upheld ordinances that favor local businesses as permissible under the Equal Protection Clause. For example, in *Walsh Constr. Co. of Ill. v. City of Detroit*, 257 F. Supp. 2d 935 (E.D. Mich. 2003), the court rejected an equal protection challenge to an ordinance that gave credits to local bidders on public works projects. In so ruling, the court found that the "the application of [] equalization percentage credits to bids where non-Detroit bidders are present is rationally related to a legitimate state purpose of promoting local businesses." *Id.* at 940; *see Kasom v. City of Sterling Heights*, 600 F. Supp. 1555, 1561 (E.D. Mich. 1985)

(rejecting equal protection attack upon city's unwritten policy of favoring local businesses in public works projects, noting that the city "could reasonably desire to have local businesses bid on public works contracts").

The parties have not cited, and the Court has not found, cases wherein a court has directly ruled on the issue of whether local hiring quotas for municipal contracts violate the Equal Protection Clause. In *United Bldg. & Constr. Trades Council of Camden v. Mayor & Council of Camden*, 465 U.S. 208, 104 S. Ct. 1020, 79 L. Ed. 2d 249 (1984), an association of labor organizations challenged a municipal ordinance requiring that at least 40% of employees of contractors and subcontractors working on city construction projects be residents of the city. The Supreme Court found that the ordinance presented a potential violation of the Privileges and Immunities Clause because it treated out-of-state residents less favorably than those living within the city limits, and remanded for a determination as to whether the ordinance was carefully tailored to "counteract the grave economic and social ills" of unemployment of city residents and a sharp decline in the city's population. *Id*. at 222.

As to the equal protection challenge, however, the Supreme Court ruled that the city had mooted this claim by removing from its ordinance the requirement that residents live in the city for one year before they can reap the benefits of the local hiring preference. *Id* at 213. While the equal protection claim specifically challenged the one-year residency requirement, the implication for more general equal protection challenges to local hiring policies is apparent. Even if such policies might implicate other constitutional concerns, such as the "common calling" protected by the Privileges and Immunities Clause, it is unlikely that local hiring quotas will be found to be irrationally related to a legitimate governmental interest, such as combatting local unemployment.

9

At the hearing, plaintiff attacked the City's stated interest of alleviating local unemployment by noting that the Local Hiring Policy may result in generating no jobs for its residents. Because the Policy permits bidders to employ a workforce that is comprised exclusively of out-of-state residents, plaintiff argues that the City cannot establish that its Policy will have the desired effect of alleviating local unemployment. However, a finding that a policy or practice is rationally related to a legitimate government interest does not require studies or empirical data that demonstrate that the policy will, indeed, successfully remedy the particular ill at issue. *See Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993) (A government entity "has no obligation to produce evidence to sustain the rationality of a statutory classification. A legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data.") (quotes and cites omitted).

Plaintiff's equal protection challenge is also likely to fail because plaintiff cannot demonstrate that its members are being treated differently than similarly situated individuals. Regardless of a contractor's base of operation—either within or beyond the city limits of Akron—the successful contractor will still be drawing his workforce from the same local union hiring halls. Plaintiff's counsel acknowledged at the hearing that contractors would hire workers from the union hall and the available workers may or may not reside in Akron. (*See also* Motion at 33: "a unionized contractor cannot identify prior to bidding what employees will be used on their project let alone where they may live because those requests are made at the time of need from the union hall and the next available qualified individual is supplied to the contractor.") Therefore, clearly, *all* contractors are faced with the same situation; plaintiff's members are not unique in this regard. Similarly, should there not be a sufficient number of Akron residents available at the union hall for a given project, *all* contractors, including plaintiff's members, have

10

available to them the same conditional waiver contained in the Local Hiring Policy at § 1.04. (Doc. No. 1-1 at 15.) Plaintiff's members are treated the same as all other contractors. The availability of Akron residents to satisfy the local hiring quota will be the same whether the contractor is located near or away from the City of Akron. [11]

The Court, therefore, concludes that the factor of substantial likelihood of success does not weigh in favor of granting a preliminary injunction.

## B.      Irreparable Harm to Plaintiff

Under the second factor, plaintiff must demonstrate irreparable harm, should the Court fail to grant the motion for preliminary injunction. Importantly, irreparable harm must be "'both certain and immediate, rather than speculative or theoretical.'" *Welch v. Brown*, -- F. App'x --, 2014 WL 25641, at *8 (6th Cir. Jan. 3, 2014) (quoting *NACCO Materials Handling Grp. v. Toyota Material Handling USA, Inc.*, 246 F. App'x 929, 943 (6th Cir. 2007)). Alleging only a possibility of irreparable harm does not suffice and undermines the characterization of a preliminary injunction as an extraordinary remedy. *Residential Fin. Corp. v. Jacobs*, No. 2:13-cv-1167, 2014 WL 682486, at *2 (S.D. Ohio Feb. 21, 2014) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L. Ed. 2d 162 (1997)).

"It is well settled that 'a plaintiff's harm is not irreparable if it is fully compensable by money damages.'" *Bearing Distrib., Inc. v. Rockwell Automation, Inc.*, No. 1:06CV831, 2006 WL 1174279, at *7 (N.D. Ohio Apr. 28, 2006) (quoting *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)). "[I]f the nature of plaintiff's loss would make the damages difficult to calculate[,]" the loss is not fully compensable by money damages. *Certified*

---

[11] Defendant's supplemental memorandum, with its attached declaration of William Orr, Business Manager for Laborers Local Union 894, represents that there are sufficient Akron resident laborers in that one union alone to satisfy the mandatory participation levels. (Orr Decl. [Doc. No. 15-1] ¶¶ 6-7.)

*Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) (cite and quote omitted). Competitive injuries and loss of goodwill, for example, "are difficult to quantify." *Basicomputer*, 973 F.2d at 512.

"Courts have also held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights." *Overstreet*, 305 F.3d at 578 (collecting cases); *see also Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (establishing substantial likelihood of success on merits of First Amendment claim also establishes irreparable harm). If, however, it is "unlikely" that plaintiff can demonstrate "a cognizable constitutional claim[,]" the court need not presume irreparable harm based on the alleged constitutional violation. *Overstreet*, 305 F.3d at 578.

As a result of the Local Hiring Policy, OCA claims its general damages will include "the loss of volume of work and business earnings, loss of work due to uneven bidding requirements, fines, increased costs of construction, increased bid costs, fewer projects on which to bid or work, layoffs, reduced productivity and profit, and increased costs to try to comply with the Local Hiring Policy's requirements." (Doc. No. 2 at 25.) If the Local Hiring Policy is not enjoined, OCA claims that its members will suffer the irreparable harm of "violation of their rights under the Equal Protection Clauses of the Ohio and United States Constitutions[,]" which cannot be adequately compensated by money damages. (*Id*. at 31.) Additionally, OCA alleges irreparable harm in the "remaining projects that make up the more than $1 billion CSO Program[,]" if the Local Hiring Policy stands. (*Id*. at 32.) "OCA's members (and all other contractors) that bid on the City's CSO Program projects will be irreparably harmed by having to adjust their bids upwards, lessening the chance of being the 'lowest bidder,' or not even

12

submitting bids at all." (*Id.*) Money damages for future uncompetitive bidding processes, OCA alleges, are "not ascertainable." (*Id.*)

While OCA correctly points out that an equal protection violation causes irreparable harm, OCA is unlikely to succeed on its constitutional claim, as set forth above. Irreparable harm, therefore, need not be presumed. *See Overstreet*, 305 F.3d at 578; *Lieberman v. Husted*, 900 F. Supp. 2d 767, 781 (S.D. Ohio 2012). Indeed, as the Court has explained, the Local Hiring Policy does not create a competitive disadvantage for OCA members, all of whom currently stand on equal footing under the Policy with each other and with other contractors.

The remaining harms are either purely economic[12]—loss of work, increased costs, reduced productivity and profit, etc.—and thus compensable by money damages, or too speculative or theoretical to justify injunctive relief. Plaintiff admits that the remaining CSO Program projects are future projects that would cause future injuries. (Doc. No. 2 at 32.) Any harm caused by the Local Hiring Policy in any other CSO Program project is pure speculation at this point. *See Inland Waters Pollution Control, Inc. v. City of Detroit*, No. 12-10434, 2012 WL 426391, at *2 (E.D. Mich. Feb. 8, 2012) (the possibility that plaintiff would not be awarded future contracts was not irreparable harm).

Moreover, plaintiff's long delay in bringing this lawsuit lessens the importance of the irreparable harm factor. *See Allied Erecting & Dismantling Co., Inc. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 405 (6th Cir. 2013) ("[A]n unreasonable delay in filing for injunctive relief will weigh against a finding of irreparable harm.") (cite omitted); *see also Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) ("Though such delay may not warrant the denial of ultimate relief, it may standing alone, . . . preclude the granting of

---

[12] OCA did not allege loss of goodwill.

13

preliminary injunctive relief.") (cite omitted). OCA President Christopher L. Runyan wrote a

letter to John Moore, the City's Public Service Director, decrying the City's "local hire quotas"

on February 13, 2014. (Deft. Hr'g Ex. A.) Fairly construed, this letter indicates that OCA let at

least two months[13] lapse during which it had full knowledge of the local hire quotas and the harm

they allegedly would cause OCA. OCA instead waited until the eve of bidding to seek injunctive

relief, compromising defendant's ability to finance the Rack 15 Project.[14] Even if OCA had

demonstrated irreparable harm, which it has not, its unconscionable delay in bringing this lawsuit

diminishes whatever irreparable harm might exist.

## C.      Substantial Harm to Others

Plaintiff argues that the harm to its members "far outweighs" any detriment to the

City. The record shows otherwise. Hewitt attests as follows:

> 11. The bid document provides that the Rack 15 Basin must be completed
> by the achievement of full operation deadline of October 31, 2015.

> 12. The Consent Decree provides that the City of Akron will be liable for
> stipulated penalties for failure to meet deadlines and requirements within the
> Consent Decree and the LTCP [Long-Term Control Plan] Update.

> 13. Paragraph 35 of the Consent Decree provides that stipulated penalties
> shall accrue in the amount of $1,500 per day for the first thirty days of failing to
> meet a deadline within the approved LTCP Update. The amount of the stipulated
> penalties increase to $3,000 per day for the next thirty days of a failure to meet a
> deadline, and to $5,000 per day, thereafter.

> 14. The City of Akron expects to award a conditional contract to a
> qualified bidder by May 12, 2014.

---

[13] Additionally, "the City advertised information pertaining to the Project via a Public Improvement Legal Notice on April 5, 12, and 19 of this year. . . . In the same Public Notice, the City likewise advertised that a two hour pre-bid meeting would be held on April 16, 2014 and expressly stated that 'representatives will be on-site to discuss the project.'" (Doc. No. 11 at 68.)

[14] James Hewitt attests that the CSO Rack 15 Project must be completed and in full operation by October 31, 2015. Under the Consent Decree in Case No. 5:09cv272, the City is liable for stipulated penalties for failure to meet deadlines and requirements in the Consent Decree. (Hewitt Decl. ¶¶ 11, 12.) These penalties start at $1,500/day for the first 30 days, and increase to $3,000/day for the next 30 days, and $5,000/day thereafter. (*Id.* ¶ 13.)

15. The City of Akron has a pending loan application under the Water Pollution Control Loan Fund, which is administered by the Ohio EPA, for the full cost of the Rack 15 Basin. The City of Akron cannot construct this project without obtaining a loan.

16. The City of Akron needs to provide the Ohio EPA with a copy of the conditional contract and the bid tabs, in addition to other documents, in order to obtain the Ohio EPA's approval of the loan.

17. If the City can submit the bid tabs and the name of the prospective lowest and best responsible bidder on May 5, 2014 and the remaining documents on May 13, 2014, it is the City's understanding that the Ohio EPA will issue an approval of the loan by May 29, 2014. The City of Akron will provide the contractor with a Notice to Proceed as soon as it receives approval of the loan from the Ohio EPA. If the City is delayed in opening and evaluating the bids, it will not meet these deadlines.

18. In order to complete construction and achieve full operation by the LTCP deadline for the Rack 15 Basin, the City must provide a Notice to Proceed shortly after May 29, 2014. If the City cannot provide the Notice to Proceed by this time, it will delay in the deadline for completing construction.

19. If the City does not provide the Ohio EPA with the necessary documents during the early part of the week of May 12, 2014, the City will not receive an approval of the loan in May 2014.

20. If the City misses the current schedule for obtaining a loan from the Ohio EPA, the next earliest date for obtaining approval of the loan will be June 26, 2014 and providing a Notice to Proceed will be July 1, 2014. Therefore, if there is any delay in evaluating the bids and awarding the contract, the City will be liable for a minimum of $60,000.00 in stipulated penalties.

21. Improvements to the City of Akron's sewer system are paid for by the City of Akron's Sewer Fund. Loans and other financing obtained to implement projects are repaid from the City of Akron Sewer Fund.

22. The City of Akron has a user charge system to raise revenue for the Sewer Fund.

23. In 2013, the City of Akron billed a total of $47.l million dollars to rate payers of the sewer system. Of that total, $39.8 million dollars was billed to rate payers within the City of Akron and $7.3 million dollars was billed to rate payers outside the City of Akron.

(Hewitt Decl. ¶¶ 11-23.) The City argues that delaying the opening of the bids for the Rack 15 Project will have a "domino effect" that will result in substantial harm to the City.

The only argument presented by plaintiff in opposition to this overwhelming evidence of harm to the City and its rate payers is that, under the terms of the bid packet, the City could not have met any of these deadlines anyway.[15] As support, it points to the following time periods in the bid packet that would suggest there is no real urgency, and thus no damage to the City, if an injunction is granted: (1) a 7-day period after notice by the City of selection of a prospective contractor during which that contractor must submit a list of all the subcontracts it intends to award in excess of $100,000 (Bid Packet, § 3.10 A [Doc. No. 11-1 at 92]); (2) a possible 120-day period for the City to obtain funding from the Ohio EPA, with no change in the bid price should that occur (*id*. § 2.02 [Doc. No. 11-1 at 161]); and (3) a 15-day period for the potential contractor to submit its local hiring plan (*id.* at 158).

This argument as to built-in time periods that will render the award of the bid conditional until certain other events occur does not rebut the City's evidence. The City has noted that its funding source, the Ohio EPA, will expect to see only a copy of the *conditional* contract in order to give approval to the loan. (Hewitt Decl. ¶ 16.)

Plaintiff has the burden of establishing a "specific harm," as well as a likelihood of success on the merits, in order to obtain the extraordinary relief of a preliminary injunction. *Leary*, 228 F.3d at 739 (quoting *Nat'l Wildlife Fed'n v. Burford*, 878 F.2d 422, 432 (D.C. Cir. 1989)). Here, any harm to plaintiff is speculative, especially in view of its inability to show a likelihood of success on any equal protection claim, whereas harm to the City, and to the Rack

---

[15] This argument was made both during the private conference in chambers prior to the hearing and during the hearing.

15 Project (and, perhaps, the entire CSO Program) is concrete and substantial. This factor weighs in the City's favor.

### D.      Public Interest

Finally, the Court considers whether the public interest would be served by issuing a preliminary injunction. *Overstreet*, 305 F.3d at 573. The public has interest in vindicating constitutional rights, *id*. at 579, but has no interest in vindicating constitutional rights that do not exist. *Michigan AFSCME Council 25 v. Talbot*, No. 14-CV-10947, 2014 WL 1653968, at *7 (E.D. Mich. Mar. 24, 2014) (citing *Overstreet*, 305 F.3d at 579).

Increased competition and reduced rates for services provide public benefits and advance the public interest. *Lexington-Fayette Urban County Gov't v. BellSouth Telecomm., Inc.*, 14 F. App'x 636, 640 (6th Cir. 2001). Again, however, if plaintiff cannot establish a likelihood of decreased competition due to defendant's challenged action, the public interest does not weigh in favor of granting a preliminary injunction. *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 720 n.4 (6th Cir. 2003).

OCA claims that a preliminary injunction will serve the public interest because it "will preserve the integrity of the competitive bidding process by encouraging more competition[.]" (Doc. No. 2 at 34.) OCA also asserts that enjoining the Local Hiring Policy, with its time-consuming recordkeeping requirements, serves the public interest by keeping construction costs down. (*Id*. at 34-35.) The City claims that the public interest factor weighs in its favor because the Local Hiring Policy "reduc[es] local unemployment and combat[s] declining incomes." (Doc. No. 11 at 74.)

Here, the public interest factor does not strongly favor either party. Because the Local Hiring Plan does not imperil OCA's constitutional rights, the public's interest in

17

vindicating constitutional rights is not at issue. Nor is the public's interest in encouraging competition currently threatened by the Local Hiring Policy.

While both sides have argued that their positions economically benefit the Akron public, neither side has yet supported this position beyond conclusory statements. *See Howe v. City of Akron*, 723 F.3d 651, 663 (6th Cir. 2013) (finding no economic harm to public under public interest factor when waste of public funds could not be quantified). The Court does note that, while the City has not quantified the purported public benefits of reduced unemployment or increased incomes, it has alleged that failing to meet the Consent Decree deadlines for completing the Rack 15 Project will trigger stipulated penalties. (*See* Hewitt Decl. at ¶ 13.) Although the City cites the stipulated penalties to show harm to the City itself if the injunction is granted, the public, too, has an interest in avoiding such penalties. The public interest factor, therefore, points at least slightly in favor of denying the injunction.

## IV. CONCLUSION

For the reasons set forth herein, the Court having applied the four-part test for granting a preliminary injunction and having balanced the equities in light of that test, plaintiff's motion for temporary restraining order and preliminary injunction (Doc. No. 2) is **DENIED**. Defendant shall now have the customary time for filing an answer or other responsive pleading, after which the Court will schedule a Case Management Conference. Furthermore, the Court's Order entered on May 1, 2014 (Doc. No. 12) is of no further effect.

**IT IS SO ORDERED**.

Dated: May 1, 2014

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**